G. David Haig for Mr. Sanchez Fernandez. And quite frankly, Your Honor, I will not pretend that this presents an interesting issue of wiretap authorization. Having worked in criminal defense for over 30 years, I don't think there is such a thing, but I will, in a lawyer's term, attempt to narrow the issues that I feel are important, and obviously the Court will correct me if I have misjudged what I think, quite frankly, one central issue in this particular wiretap authorization, which makes it different from any I have encountered in the past. And that, of course, is that the original authorization is written in relationship to an actual individual, Enrique Mendoza, who has an actual biography, who actually owns a business in Santa Ana. During the course of the various interceptions and during the course of the ongoing investigation, the governmental agents discover that they had sought and obtained a wiretap authorization for the wrong person, that the person they actually wanted to wiretap was a Jorge Acosta, a distinctly different person, the one who eventually became a co-defendant in this particular case, unlike Mr. Mendoza, who was once determined that he was not the person they were seeking, at least per the testimony of the agent at the November 8th Franks hearing, Mr. Mendoza ceased to be a person of interest to the government. So this Court, I think, is confronted with a situation very similar to the, at least in criminal terms, the almost ancient case of Copper, which is cited to the Court. And unlike the reliance of the government or the allegation of the government that really Mr. Acosta was using an alias, I think that distinctly understates the problem that this Court has. And I think that that problem is magnified by the kind of procedure that is condemned by this Court, by the Ninth Circuit, in Blackman, this use of boilerplate reissuing without going back to the magistrate and saying, this is what's happened in between, this is our problem as we have it today. And that, I think, is the critical error that is made in this Court. Because no matter what the magistrate might have ruled, had the magistrate been given the necessary information, that's really irrelevant to our purposes. Because at the time the agent goes back, after that August 5th, 6th, 7th time period, when they discover that they've got basically the wrong person target, I do not dispute that they might have been able to take everything they had discovered, all the phone conversations, put that into a declaration. They might have been able to say... Well, I'm not sure they've got the wrong person. They've got the wrong name. But... And they stayed with the right person, they just didn't correct the name.  They're targeting the wrong person in the paperwork. They are targeting what they consider the right person when they go out and do their actual interceptions. And the reason they've got the right person but the wrong name is that the right person is using the wrong name. Well, he is at points, he's using other names, he's using other topics. I'm not saying this would have been easy. Right. But there is a point... But let me give you a simple hypothetical. Sure. I'm after somebody whose real name on his birth certificate is Joe. But he keeps calling himself, for whatever reason, maybe evasion of authorities, I don't know, he keeps calling himself Billy. And I think his real name is Billy. So I get a wiretap authorization against Billy. Well, it turns out there's another Billy in the class, but the Billy I'm going after is the guy who really is Joe. I don't think there's anything wrong with my wiretap authorization. At that point, I would tend to agree with the Court. As the Court has said, I can assume that to be true. Why merely tend? I mean, my God, I'm after Joe. Joe calls himself Billy. I use the name Billy on the wiretap authorization that I'm seeking. And I get it. And I wiretap this guy Joe who calls himself Billy. What's wrong with that? The problem is when you go back to get your reauthorization and you don't go, you find out, whoops, it wasn't Billy II I was after. It's this guy Joe who is calling himself Billy. And you don't go back to the magistrate when you ask for these reauthorizations to say, oops, I made a mistake. Here's what went on. This is why I made the mistake. I'm still after this guy who uses the name Billy. But this is his biography. And the difference is in the authorization, the biography that's set out is the innocent Billy. It's the guy who owns the DMV shop. And the showing of necessity is based upon that Billy, not the Joe Billy who is the bad person. For all we know, to put it in terms of the authorization, and remember, the magistrate has to reconnect to all those issues relating to necessity. For all we know, the bad Joe Billy is doing business in a shop that says, cocaine for sale, come on in. And the necessity is nonexistent, that this guy could be picked up, probably send an officer in in uniform and make a sale. I mean, clearly it's an absurd type of thing, but that's the reality of what is not revealed to the magistrate. And that is the harm that ensues in this sort of cavalier attitude that we don't have to go back, we don't have to explain our mistake, we don't have to get a new authorization. That's the problem, I think, that this Court addressed in Blackburn. It has become, in these wiretap authorizations, and I feel, quite frankly, for the government and the agents, the amount of paper that goes into these things, the constant repetition with the 10-day reports and the reauthorizations, they have to redraft every time you go back. This Court knows, and we all know, that you get briefs that have been recycled. It's not something that doesn't happen. But the reality of the situation is, once in that August 6th, 7th, 8th time period, that the agents knew that they had a different person. They've got to stop, or maybe they can continue momentarily, but race down and say, look, we've got a problem, here's some new declarations, here's the new biography. This is what we now know about the person we thought was Enrique, who is actually Jorge. And this is why we have the necessity to continue. And all that stuff we legitimately got when we legitimately thought we were after Jorge, but under a different name, that still applies. But now, here's our showing of necessity. Here's why we need to continue these taps. Here's what we know about his organization. Here's why we can't get to his organization. And, of course, it's in that time period, when they don't do that, that all the interceptions that relate to my client are made. So as to my client, it's an absolutely critical period of time. And the failure, it may seem technical, but if you know one thing about wiretap interception, it is a highly technical area because it is a disfavored form of investigation. We use it out of necessity, but we require the government to go through steps to ensure that none of us have our phones intercepted. I mean, it is a reality. And that, Your Honor, is, for all practical purposes, since I'm hitting some up at this point, so much for my brief comment. Counsel, you have about a minute and 40 seconds. Do you want to reserve? I'll keep talking. I don't think I need to reserve. All right, very good. I just want to do a quick little thing about the safety valve. And I raised this in front of the district court, and the government responded then as they responded in their brief. To me, it is clear that my client did not possess that weapon anywhere in the course of the conspiracy. And I've laid out my chamber of horrors type of thing. Any conspirator anywhere would then be. But the government's position, which they have taken, that even my client's motivation for the gun somehow relates to drug use because of a home invasion robbery, and say, well, that happens to drug dealers. Well, home invasion robberies happen to everybody. It's in rich neighborhoods, poor neighborhoods, all over the place. And the Second Amendment of the Constitution allows individuals to protect themselves by the use of firearms. I guess we'll see. I don't mean with respect to you that there's a case in the D.C. Circuit. As I said, we're all waiting. But in any event, I'll reserve 30 seconds if I may. All right. We'll hear from the governor. Thank you, Your Honor. Christopher Brunlin for the United States. Your Honor, if I may, Appellant argued a number of issues in his brief, but including the safety valve issue, his brief addresses a number of issues with regard to the wiretap. But I'll go right to the argument the defense counsel made here. I'm happy to go to the other issues as the Court sees fit. But the Court's analogy as to the identity or the use of an alias in this case, the Court's analogy addressing that circumstance is exactly this case. On the record in this case, the facts about the government's efforts to identify during the course of this investigation sources of supply or the primary source of supply for a large-scale cocaine trafficking organization and the use of an alias by a large-scale drug trafficker is a common occurrence. But what about the argument? I mean, I don't fault the government at all going in initially with the name that is the alias. But they're going in using the name as the alias, describing, as I understand it, the biography of the person who actually has that name and saying, here's why we can't, by normal investigative techniques, find out what this real guy is up to. Then there comes a time when they realize that the guy that they're tapping and that the guy they're actually investigating isn't the person that they've described as this guy over here with the auto shop and so on, but he's rather somebody else. Why doesn't the government at that point, I mean, I'm just asking you to respond to the argument, at that point have to come back in and say, well, you know, the guy we've been wiretapping, we now discover is using an alias, here's who he really is, and here's why we can't get at this guy, who he really is, by other ordinary investigative means. Why doesn't the government have to come back at that point and make that argument or make that showing? Because, and I want to answer that on a number of levels, but first and most directly is that the law does not, the probable cause showing is not as to the person. It is as to the use of that phone. And that is, as the Court recognized in Kahn and laid out, that the clear implication of the language, and this is cited in the government's brief, I don't want to belabor the point, is that when there is probable cause to believe that a particular telephone is being used to commit an offense, but no particular person is identifiable. And I want to come back to that because it speaks to, and again, I have to say the precision of the Court's analogy, because unlike a typical scenario we might envision where someone draws an alias out of the air and assumes a name, the target in this case actually used a name of somebody who did exist and was apparently on the facts of the case known to that person based upon that person's contact with Enrique Mendoza's business. So it was an effective ruse in a sense, and it had the effect of having agents go out and look at that person believed to be at one time the user of the phone possibly and then possibly involved. It goes to the sophistication of the organization. And it also speaks to the necessity for a wiretap that sophisticated drug traffickers are often aware of investigative tools used by the government and devise uses of aliases and means to avoid that type of detection. The district court in this case, and I think what distinguishes this case from the case relied upon by the appellant, the Capra case, the facts of Capra are not the facts of this case. The district court correctly found, I believe the court acknowledges or indicated, that the person named in the order authorizing the wiretap as Enrique Mendoza was always the same person. It was the person whose voice had actually been heard on the various target telephones. And because the voice now identified as Acosta's in subsequent affidavits, and I'll come back to that, was the voice of the person Judge Lew meant to authorize the government to tape or monitor, he was not required to cease taping or minimize any calls attributable to Acosta. There was never a situation like in Capra where the government was monitoring the wrong person or monitoring someone else. Capra is a case out of New York based on New York law in 1971 in which there was authorization to monitor a telephone in a public bar. And they tapped the phone based upon the desire to listen to one person and then actually ended up listening to a completely different person. That's not the case here. Now, the law, again, goes to the use of the phone, but the facts of Capra are not the facts of this case. Now, as to whether the government should be required when it learns not that it's monitoring a different person, because that's not what happened here, but that the person whose name they believe to be Enrique Mendoza, there comes a point in time when they believe that name to be Jorge Acosta, and eventually later they learn it to be Gabriel Silva Arredondo, that they should then minimize the conversations and go back to the judge. Let me ask you this. What justification did the government make going in for the wiretap authorization in terms of necessity? I confess I should know this, but I'm not sure I have it fully in mind. What did the government say as to here are the investigative techniques that we've tried, here are the investigative techniques that we would try if they would possibly work, here's why none of them work and why we have to do a wiretap? What did the government say? Well, Your Honor, and you'll have to indulge me, it is a very long showing. And in each of the affidavits submitted by the government, and there were six affidavits submitted in this case during the course of the investigation, and the government details what steps had been taken in the investigation, what are the conventional investigative tools used by the government, whether the attempts to use informants, whether the attempts to use surveillance, all the including potential opportunities for a grand jury, subpoenas and the like, these are the analysis that are addressed and are addressed in each of the affidavits. And how much of that justification is dependent upon the government's initial good faith belief that the person they were tapping was Mr. Mendoza, the real Mr. Mendoza? I don't think you can quantify to say that, you know, does it address specifically, is it hinged on the idea that this is a Mr. Mendoza? I think what you see is the fact that, and the government lays out its difficulty, its goals in the investigation, which is the identification of sources of supply and customers and the use of identities, potential for fake identities by the targets, and the fact that it is very possible and considered in the course of the investigation that an individual, particularly a large-scale cocaine trafficker, and these are multi-kilogram quantity cocaine traffickers, persons who are engaging in hundreds of thousands of dollars' worth of cocaine transactions at a time, that they will use fake identities. So in responding to your question, I don't think you can quantify that a particular part hinges on the identification. And I may be misunderstanding the question, but that a particular part links to that in the sense that the totality of what is presented in support of the government showing is what goes to the determination that there is probable cause to believe that the user of a particular phone, which the law and the Kahn case recognizes, is a circumstance where the identity of that user is frequently not known to the government. So to say that the government, when the law addresses a circumstance where the government may not be able to identify the particular individual who is actually using that phone, maybe not even until that person is actually in custody by name, that it really is not the greatest factor in determining. It is part of what the government puts forth, but it's certainly not dispositive and the law doesn't address it as being the singular issue. With regard to just briefly on the safety valve issue, I think it's fair to say that the Court applied the law as it stands. I don't think there was any showing by the defense, in this case the appellant, and it is the appellant's burden to show that he is entitled to a downward departure, but that the possession of the firearms, I believe there was firearms, a military flak vest and a bulletproof vest, that those things were not possessed by him in connection with the offense. Rather, as the Court seemed to indicate, the fact that he felt a need for those things is very consistent with the type of dangers that a drug trafficker exposes himself to. Thank you, counsel. Your time has expired. Thank you. Mr. Hay, you have a little bit of time left. Let me just use my 30 seconds to just very briefly respond to Your Honor's last question. And I haven't had time to go through the briefs, but I do believe that part of the necessity showing as to Enrique, the actual Enrique, was he appeared to be able to conceal himself and he had legitimate businesses. This is a biography that was part of the original necessity showing. I would submit to the Court that once they knew it was Jorge, they had to do a new necessity to the magistrate. And on that, I'll submit it to the Court. Counsel, your time has expired. Before submitting the case, I wanted to mention to Mr. Hay that we were disappointed with your brief to the extent that it barely complies with Rule 28. As you realize, the rule requires that there be specific citations to the record with respect to each argument that is being made, and it appears that the discussion of the suppression motion does not contain a single citation, and the discussion of the purported error of sentencing cites once to the PSR and once to the district court record. And it's below the standard we like to see. There's no pending motion to strike the brief or anything like that, but I just thought that on behalf of the panel that we should make that observation. I would apologize, Your Honor, and a great deal of the problem was we had this enormous record that was done for the original hearing itself, and I was trying to get this into something that would be usable for this Court without asking for the Court to refer to what was about 1,000 pages. And I think in my efforts to compress, I failed to specify. Well, we count on you to help us get to the key pages out of the 1,000 pages so that we can focus as quickly as we can. As I said, I apologize to the Court for that, and I don't offer it as an excuse, just an explanation. That's fine, counsel. Thank you very much. The case just argued will be submitted for decision, and we will hear argument next in Trustees v. Flores. Thank you.
judges: Goodwin, O'scannlain, Fletcher